UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FARM BUREAU MUTUAL INSURANCE
COMPANY OF MICHIGAN *et al.*,

        Plaintiffs,

v.

BORKHOLDER BUILDINGS
& SUPPLY, LLC,

        Defendant.
_____/

Case No. 1:14-cv-1118

HON. JANET T. NEFF

**OPINION**

Pending before the Court is Defendant Borkholder Buildings & Supply, LLC's Motion to Dismiss the Complaint (Dkt 22). Plaintiffs Farm Bureau Mutual Insurance Company of Michigan, DeYoung Pork, Inc., and DeYoung Farmland, LLC, have filed a Response in opposition (Dkt 25), and Defendant has filed a Reply (Dkt 23). Having fully considered the parties' briefs and the record, the Court concludes that oral argument is unnecessary to resolve the pending motion. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court grants the Motion.

**I. Facts**

In 2008, Plaintiff Farm Bureau's insured, Plaintiff DeYoung Farmland, contracted with non-party Farmer Boy Ag Systems, Inc., for the construction of an 81' x 324' hog building, using trusses manufactured and supplied by Defendant Borkholder. The hog building was completed in May of 2008. On or about February 18, 2014, several of the trusses failed, causing a large portion of the hog building roof to collapse. The insureds submitted an insurance claim for $338,381.00 to Farm Bureau for coverage related to the damage to the hog building and the loss of hogs.

Farm Bureau paid the claim and became subrogated to the rights of the insureds. Farm Bureau paid DeYoung Farmland $300,000 for the damage to the hog building and $30,000.00 for debris clean-up; and paid $8,381.00 to insured DeYoung Pork for the loss and relocation of hogs. Plaintiffs allege that DeYoung Pork and DeYoung Farmland also incurred out-of-pocket damages of $79,915.00. *See* Compl. ¶¶ 8-13. Plaintiffs assert that they sustained $388,296.00 total damages caused by Defendant's defective trusses (Pls. Resp., Dkt 25 at Page ID# 143).

Plaintiffs filed this one-count Complaint asserting a claim of breach of implied warranty based on, among other things, alleged manufacturing defects in the trusses. There is no dispute that Michigan law applies.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes the court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). However, a court "need not ... accept as true legal conclusions or unwarranted factual inferences." *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006).

The complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is "a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

The Sixth Circuit has emphasized that because the statute of limitations is an affirmative defense, a motion under Rule 12(b)(6) "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations," *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012); however, there are exceptions to this general rule, including if "the allegations in the complaint affirmatively show that the claim is time-barred." *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

### III. Analysis

This case presents a recurrent theme in deciding whether the judicially-recognized economic loss doctrine precludes recovery for commercial property losses sustained by the plaintiff hog farm businesses: that is—on which side of the dividing line between tort and contract law do the losses fall based on the surrounding circumstances and case precedent? If they fall in the realm of tort law, as Plaintiffs contend, then Plaintiffs may proceed with this action to recover potential damages of $388,296.00 from the collapse of the hog barn. If, however, they fall in the realm of commercial contract law, as Defendant argues, then the exclusive remedies of Michigan's Uniform Commercial Code[1] apply, including the four-year statute of limitations, as does the economic loss doctrine, barring Plaintiffs' recovery.

---

[1] MICH. COMP. LAWS § 440.2101 *et seq*.

A. Economic Loss Doctrine

"'The economic-loss doctrine is a judicially created doctrine that bars all tort remedies where the suit is between an aggrieved buyer and a nonperform[ing] seller, ... and the only losses alleged are economic.'" *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239 (6th Cir. 1994) (quoting *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.*, 480 N.W.2d 623, 627 (1991)). The rationale underlying the doctrine was explained in *Detroit Edison*:

> Tort and contract law normally occupy distinct spheres. Tort law, and products liability law specifically, governs the relationship between a consumer and a manufacturer, where it is impractical or impossible for the parties to negotiate either the terms of a sale or each party's duty to the other. In this context, product liability law places a burden on the manufacturer—the party in the better position to avoid the harm of a defective product—to produce a safe product. In contrast, contract law applies to commercial transactions, where the terms and conditions of a transaction can be negotiated to each party's satisfaction. Contract law operates on the premise that commercial actors, because of their ability to bargain for the terms of the sale, will be able to allocate the risks and costs of a product's potential nonperformance.
>
> The distinction between tort and contract becomes problematic when … a commercial buyer seeks to recover *in tort* for damages caused by a defective product which was purchased in a commercial setting. In pursuing such recovery, the buyer asks for more than the benefit of the bargain; the buyer wants to be put back where he was before the product failed. In this situation, the economic loss doctrine defines the boundary between what a buyer in a commercial setting can and cannot seek to recover in tort.

35 F.3d at 239.

The Michigan Supreme Court adopted the economic loss doctrine in *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 618 (Mich. 1992), holding that "where a plaintiff seeks to

recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC, including its statute of limitations."[2] However, the court has yet to provide clear guidance on the determinative factors for applying the economic loss doctrine. Consequently, the task falls upon the litigants and courts applying *Neibarger* to discern the distinguishing factors in each case that adhere to the doctrine's rationale and result in a logical and legally supportable outcome.[3]

### B. Application

In this case, Defendant argues that Plaintiffs' claims arise out of the construction of a hog building in which the trusses were used, and that the hog building was used for DeYoung's pork farming business, which is purely commercial. The damage caused by the allegedly defective trusses was damage to the building itself, as well as to DeYoung's livestock. DeYoung therefore suffered only economic losses, and Plaintiffs' exclusive remedy is provided by the UCC, including its four-year statute of limitations. *See Neibarger*, 486 N.W.2d at 618. Defendant thus contends that the economic loss doctrine applies, and Defendant is entitled to dismissal of Plaintiffs' tort action. Further, because the trusses were delivered sometime in 2008, Plaintiffs' October 20, 2014 Complaint is barred by the statute of limitations.

---

[2] The statute of limitations, MICH. COMP. LAWS § 440.2725(2), generally bars actions filed more than four years after delivery of the goods, regardless when the customer discovers the product is defective. Thus, the statute recognizes no "discovery rule." *Neibarger*, 486 N.W.2d at 613.

[3] As Plaintiffs note: "'To the extent that the state supreme court has not yet addressed the issue presented, it is [the federal courts'] duty to anticipate how that court would rule.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (citation omitted).

In *Neibarger*, 486 N.W.2d at 613, the court considered two separate cases in which the plaintiffs dairy farmers purchased milking systems designed and installed by the defendants. In short, after a period of time, the cattle became ill and died or had to be sold for beef because of their nonproductivity and unsuitability as milking animals. *Id.* at 613-14. Some seven or eight years after the installation of the systems, the dairy farmers filed suit, alleging that the milking systems were improperly designed and/or installed and seeking recovery for their losses. *Id.* The court held that the damages sought by the farmers were commercial losses that could be remedied only under the provisions of the UCC, finding that "the damages suffered by the plaintiffs are properly considered to be economic loss, the result of a defect in the quality of the milking systems they purchased." *Id.* at 621. The court noted that "the UCC provides remedies sufficient to compensate the buyer of a defective product for direct, incidental, and consequential losses, including property damage." *Id.* at 620. "Where damage to other property was caused by the failure of a product purchased for commercial purposes to perform as expected, and this damage was within the contemplation of the parties to the agreement, the occurrence of such damage could have been the subject of negotiations between the parties." *Id.* Because the plaintiff farmers' attempts to recover for lost profits and consequential damages were losses compensable under the UCC, the actions fell "squarely within the economic loss doctrine" and were governed by the provisions of the UCC, including its four-year statute of limitations. *Id.* at 621.

Plaintiffs argue that *Neibarger* does not dictate a similar result in this case. Plaintiffs argue that they are not limited to remedies in contract or the UCC, but have a proper remedy in tort. Plaintiffs assert that Defendant designed, manufactured and sold an unreasonably dangerous product, which caused extensive damage to property other than the product itself. Further, Plaintiffs had no

6

contractual relation with Defendant, and thus the failure of the trusses and collapse of the roof would have been beyond the contractual contemplations of the parties. Plaintiffs note that they are not in the lumber business and did not deal in goods such as truss design and construction. Thus, because Plaintiffs' other property damages were not and could not have been contemplated and were instead the result of a sudden calamitous event, they are remediable in tort. Accordingly, the three-year statute of limitations for torts applies and began to run when Plaintiffs discovered that Defendant's trusses were defective, which was on February 18, 2014, when the roof collapsed (Pls. Resp. at Page ID# 155, citing MICH. COMP. LAWS § 600.5805(10), (13)). As a result, Plaintiffs' action is not time-barred.[4]

The general rule from *Neibarger* remains the starting point for courts struggling with the practical application of the economic loss doctrine:

> The economic loss doctrine, simply stated, provides that "'[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses.'" This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts.

*Neibarger*, 486 N.W.2d at 615 (footnotes omitted). While Plaintiffs' arguments may have some appeal under the general rule of *Neibarger*, subsequent case law informing the *Neibarger* principles cannot be ignored, and those cases effectively foreclose Plaintiffs' arguments.

First, the fact that Plaintiffs suffered damages to "other property" does not render Plaintiffs' action exempt from the economic loss doctrine. As Defendant points out, following *Neibarger*, the

---

[4]Plaintiffs note an issue whether the trusses are "goods" under the UCC, but they advance no argument in this regard, and the Court therefore does not address the issue.

Sixth Circuit addressed the so-called "other property" exception to the economic loss doctrine in *Detroit Edison*, 35 F.3d at 242-43. In that case, Detroit Edison brought a products liability action against power plant pipe suppliers, arising from a pipe explosion at its Monroe power plant. *Id.* at 237-38. "The blast injured seventeen people, damaged the pipe itself and adjacent equipment, demolished the brick walls of a storage room and office more than forty feet away from the pipe, blew out windows, knocked out part of an aluminum wall, caused wall panel deformation, displaced floor plating panels, damaged hydraulic lines, wires and insulation, causing an oil fire to ignite, and blew asbestos-containing material throughout the entire plant, requiring substantial clean-up." *Id.* at 238. Relying on the approach adopted in *Neibarger*, the court held that the damages sought by Detroit Edison for the alleged manufacturing defect in the pipe were economic losses, and accordingly, the economic loss doctrine barred any tort claims by Detroit Edison. *Id.* at 242. "The rule that emerges from *Neibarger* significantly narrows the 'other property' exception while expanding the definition of economic loss." *Id.* at 241.

"Michigan's economic loss doctrine is broader than other jurisdictions in that it not only includes damage to the product itself, but may also include damage to other property when 'this damage was within the contemplation of the parties to the agreement ….'" *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 862 n.4 (Mich. Ct. App. 2002) (quoting *Neibarger,* 486 N.W.2d at 620 and *Detroit Bd. of Ed. v. Celotex Corp. (On Remand)*, 493 N.W.2d 513 (Mich. 1992)). In *Neibarger*, the court noted that "there was support for the view that the UCC did not bar a tort claim where the plaintiffs sought to recover for property other than the product itself, but ruled that where the damage to other property was caused by the failure of a product to perform as expected, and that damage was in the contemplation of the parties, the occurrence of such damage

could have been negotiated by the parties." *State Auto Ins. Cos. v. Siemens Bldg. Techs., Inc.*, No. 10–10896, 2010 WL 1782148, at *1 (E.D. Mich. May 4, 2010) (citing *Neibarger*, 486 N.W.2d at 620).

Plaintiffs' argument that a "calamitous event exception" to the economic loss doctrine was left open by *Neibarger*, and should be applied in this case, is also dubious. Plaintiffs state that they have been unable to find any Michigan court decisions defining this exception; however, courts in Illinois have considered a similar "sudden and dangerous occurrence exception" (*see* Pls. Resp. at Page ID# 148). Plaintiffs assert that their damages are not the result of a disappointment with Defendant's trusses that performed unsatisfactorily, but rather of a disaster—the roof collapse—a sudden calamitous event. However, this type of exception has been addressed subsequent to *Neibarger* in the context of Michigan law, and has been rejected with regard to commercial contracts.

For instance, in *Detroit Edison*, the Sixth Circuit addressed Detroit Edison's reliance "on a distinction between 'disaster and mere commercial disappointment,'" and the assertion that the explosion was a "'calamitous,' unforeseeable disaster that falls within the purview of tort law." 35 F.3d at 242. The Sixth Circuit acknowledged that "the extent of the damage—both to property and persons—suggests a hazardous product and therefore implicates concerns addressed by tort law." *Id*. The Court noted, however, that the approach adopted in *Neibarger* focuses not so much on the magnitude or extent of the damages as on the parties involved and the nature of the product's use. *Id*. And there, the parties were sophisticated commercial entities of equivalent bargaining power, they were in a position to fully negotiate the issue of potential liability, and could have passed on their respective costs for the risks of a defective product as a cost of doing business. *Id.*

In their response, Plaintiffs rely extensively on *Citizens Insurance Company of America v. Proctor & Schwartz, Inc.*, 802 F. Supp. 133 (W.D. Mich. 1992), a Western District of Michigan district court case in which the court took a "compromise approach" to the economic loss doctrine, applying it to the damage to the defective product, but not to the damage to the "other property." In *Citizens Insurance*, a subrogated insurer brought suit on behalf of the Koeze Company, which suffered damages when a peanut roaster purchased through a sales agreement with the defendant company, caught fire and caused substantial damage to the roaster and a conveyer cleaner (also purchased in the agreement), as well as other property owned by Koeze. 802 F. Supp. at 136. The court found that the damages were caused by a sudden calamitous event and were the result not of disappointment with machinery that performed unsatisfactorily, but of a disaster, the fire, allegedly caused by the defective product. *Id.* at 140. The court observed that the losses caused by fire damage to property other than the defective product, were the sort traditionally remediable in tort: "Even though they are 'economic losses,' in the sense that they are assigned monetary values, they are not the sort of usual commercial losses that should naturally have been within the parties' contractual contemplation and that would therefore be remediable exclusively in contract." *Id*. Plaintiff is correct that the court held that the economic loss doctrine barred recovery in tort for losses caused by fire damage to the peanut roaster and conveyor cleaner, but did not bar Citizens' tort claims for losses resultant from fire damage to other property. *Id.* at 142. However, the Sixth Circuit subsequently explicitly rejected the approach taken in *Citizens Insurance*:

> The "compromise" position of the district court in *Citizens Insurance*, like the prior position of the Michigan Court of Appeals, by applying the economic loss doctrine while still allowing some recovery in tort (recovery which could be substantial), eviscerates both the effect of *Neibarger* as well as the policies underlying the economic loss doctrine.

*Detroit Edison*, 35 F.3d at 242-43.  Plaintiff's reliance on *Citizens Insurance* is of no avail.  The Sixth Circuit's rejection of *Citizens Insurance* is clear, as is its rejection of the "other property exception" urged by Plaintiffs:

> Finally, Detroit Edison urges this court to make a factual distinction between *Neibarger* and the present case.  However, our approach requires neither reliance on nor distinction from the facts of *Neibarger*.  The aspect of the *Neibarger* decision that is dispositive of the present case is [the] definition of economic loss.  The *Neibarger* decision's interpretation of economic loss significantly curtails the applicability of the "other property" exception to the economic loss doctrine, while expanding the meaning of "economic loss."  Therefore, we believe that the Michigan Supreme Court, considering its decision in *Neibarger* and the stated policies underlying that decision, would bar Detroit Edison's tort claims and find that Dravo is entitled to judgment as a matter of law.

*Detroit Edison*, 35 F.3d at 243.  That Plaintiffs argue that *Detroit Edison* incorrectly interpreted *Neibarger* and was wrongly decided does not advance their position before this Court, which is bound to apply *Detroit Edison* as decided.

Plaintiffs also cite *Safeco Insurance Company of America v. CPI Plastics Group, Ltd.*, 625 F. Supp. 2d 508 (E.D. Mich. 2008), in which an insurer, as the insured property owners' subrogee, brought an action against the manufacturer of deck planks to recover for the fire loss of a personal residence.  The court adopted the report and recommendation of the magistrate judge, which concluded that tort law would be served by the assertion of a products liability claim, and that the economic loss doctrine did not apply.  *Id.* at 521.

*Safeco Insurance* is clearly distinguishable.  That case involved a consumer transaction, as opposed to a commercial transaction as in this case.  The plaintiff homeowners' residence was substantially destroyed in a fire that resulted from highly flammable deck planking manufactured by the defendants; the homeowners purchased the deck product from a local hardware outlet.  *Id.* at 511. The subrogee insurer sought recovery against the manufacturers for loss of the residence.

*Id.* at 510-11. The court concluded that the economic loss doctrine did not apply given that the case involved a consumer transaction and tort concerns in product safety. *Id.* at 511-12. The court concluded: "In short, the plaintiff has been injured in a manner that is traditionally considered in tort and not in contract. It is thus proper for the plaintiff be permitted to pursue a claim in tort." *Id.* at 512.

Finally, Plaintiffs' argument that the economic loss doctrine does not apply here because there is no "privity" also does not prevail. Plaintiffs rely primarily on *Quest Diagnostics*, 656 N.W.2d 858, and *Detroit Board of Education v. Celotex Corporation*, 493 N.W.2d 513 (Mich. Ct. App. 1992), as cases in point; however, both cases are easily distinguished from this case. Plaintiffs accurately quote *Quest Diagnostics*, *id.* at 864: "In order for the economic loss doctrine to bar recovery in tort, there must be a transaction that provides an avenue by which the parties are afforded the opportunity to negotiate to protect their respective interests." But there, unlike here, the purported class plaintiffs were uninvolved third parties—individuals and businesses, who suffered damages from the alleged negligent rupture of a water main by an excavator hired by the defendant communications companies. *Id.* at 860. The plaintiffs were without running water for several days, they had to boil their drinking water for several days, and the business plaintiffs were forced to close or curtail their operations. *Id.* The court observed that "[a] factor present in all cases in which Michigan courts have applied the economic loss doctrine is that the parties to the litigation were involved, either directly or indirectly, in a transaction for goods." *Id.* at 862. Unlike in that case, here, Plaintiffs were involved in a transaction for goods, albeit indirectly, for the purchase of the trusses.

Likewise, the unique circumstances that precluded the economic loss doctrine from applying in *Celotex Corporation* bear no relationship to those in this case. There, the plaintiff class consisted of several hundred public school districts and private schools in Michigan, faced with abating the potential health hazards of friable asbestos products, which could not have been bargained over at the time the products were sold because it was not until years later that the risks of asbestos material became known. *Celotex Corp.*, 493 N.W.2d at 516, 519-20. In declining to apply the economic loss doctrine, the court noted that "asbestos cases are unique in the law," and that all jurisdictions that have considered the question declined to apply the economic loss doctrine to cases concerning asbestos contamination of buildings. *Id.* at 518.

The cases relied on by Plaintiffs offer no support for a "privity" exception to the economic loss doctrine in the contractual circumstances presented here.

While no case cited by the parties is squarely on point with all the circumstances presented in this case, the decision in *Citizens Ins. Co. v. Osmose Wood Preserving, Inc.*, 585 N.W.2d 314, 316 (Mich. Ct. App. 1998), cited by Defendant, is closely analogous and effectively forecloses the entirety of Plaintiffs' arguments. In that case, the roof of a restaurant owned and operated by Kim's of Novi (Kim's) collapsed under circumstances even more contractually remote than those in this case:

> Kim's owned and operated a restaurant in Novi, Michigan. During the original 1978 construction, the builders installed wood trusses and plywood roof decking that had been treated for flame retardancy using chemicals manufactured by defendant. In 1982, Kim's had an addition to the building constructed. The roofing materials that were installed at that time had also been treated for flame retardancy using defendant's chemicals. Apparently, the wood was treated by a subcontractor according to instructions provided by defendant. Plaintiff's complaint alleged that on January 27 and 29, 1994, the wood trusses and plywood roof decking utilized in the 1978 and 1982 construction deteriorated and collapsed, "causing extensive

13

> damage to Plaintiff's subrogor's real and business personal property." Pursuant to its insurance policy with Kim's, plaintiff paid $556,111.68 for damages caused by the collapse.

*Id.* at 315. The insurer-subrogee sued the defendant manufacturer of the flame-retardant chemicals, among others, alleging that the roof collapse was caused by the deterioration of wood roofing materials that were adversely affected by the flame-retardant chemicals. *Id.* The court held, in a split decision, that the economic loss doctrine and the UCC statute of limitations applied. *Id.* at 317. Relying on *Neibarger*, the court noted that "[u]nlike some jurisdictions, the economic loss doctrine applies in Michigan even when the plaintiff is seeking to recover for property other than the product itself." *Id.* at 316.

As here, the plaintiff in *Osmose Wood* argued that the economic loss doctrine should not apply because, unlike in *Neibarger*, "(1) there was no contractual relationship between Kim's and defendant, (2) Kim's was not in a position to negotiate the terms of the sale, (3) the fire-retardant-treated wood was not directly related to Kim['s] business, and (4) Kim's could not have anticipated such an 'unforeseeable disaster.'" *Id.* The court rejected these arguments, on the grounds that the express *Neibarger* holding could not be avoided simply by distinguishing *Neibarger* on its facts. *Id.* The court further noted that in both *Sullivan Industries, Inc. v. Double Seal Glass Co., Inc.*, 480 N.W.2d 623 (Mich. Ct. App. 1991), and *Freeman v. DEC International, Inc.*, 536 N.W.2d 815 ( Mich. Ct. App. 1995), the Michigan Court of Appeals expressly rejected the argument that the economic loss doctrine does not apply in the absence of privity of contract. *Osmose Wood*, 585 N.W.2d at 316.

Plaintiffs do not address, let alone distinguish, *Osmose Wood*. Here, as in that case, the damages were sustained by a *commercial business* and the product at issue was purchased for

14

*commercial purposes*, and because the losses are economic in nature, under *Neibarger*, the UCC provides the exclusive remedy. *See Osmose Wood*, 585 N.W.2d at 316.

### IV.  Conclusion

Having fully considered the parties' arguments and relevant legal authority, the Court concludes that this action is subject to Michigan's UCC four-year statute of limitations and the economic loss doctrine, and Defendant's motion to dismiss must be granted.

An Order and Judgment will be entered consistent with this Opinion.


Dated: September 25, 2015         /s/ Janet T. Neff
                                  JANET T. NEFF
                                  United States District Judge